## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LORENZO CLERKLEY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-20-465-F |
| | ) | |
| CITY OF OKLAHOMA CITY, | ) | |
| OKLAHOMA, and KYLE | ) | |
| HOLCOMB, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

This case arises out of the non-fatal shooting of plaintiff Lorenzo Clerkley, Jr. (Clerkley) by defendant Kyle Holcomb (Holcomb), a sergeant with the Oklahoma City Police Department (OCPD).  Clerkley has sued Holcomb under 42 U.S.C. § 1983, alleging that Holcomb subjected him to excessive use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.[1] Clerkley also seeks to hold defendant City of Oklahoma City, Oklahoma (City) liable under § 1983 and under Oklahoma law for negligent use of excessive force. Holcomb has moved for summary judgment on the § 1983 claim against him, asserting the defense of qualified immunity.[2]  The City has moved for summary

---

[1] Section 1983 of Title 42 of the United States Code provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

[2] "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials[.]"  <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 411 (10th Cir. 2014)

judgment on both claims alleged against it.[3]  Upon review of the parties'
submissions, the court makes its determination.

Background[4]

1. <u>The Shooting</u>

On the evening of March 10, 2019, Holcomb was working an approved
overtime shift as part of the OCPD's VIPER program, which provides extra patrols
in areas with high rates of crime and violence.[5]  At approximately 5:43 p.m., a
woman called 911 to report that "a whole bunch of dudes just got out of a car with
guns" at a vacant house across the street from her house, and they had gone into the
house.  Doc. no. 75-2.  The caller's house and the vacant house were in a
neighborhood recognized by the OCPD as an area with high crime and violence.

The woman advised 911 that she saw one subject with a gun, whom she
described as a black male with dreads, wearing jeans and a gray hoodie.  Her
daughter saw at least two of the black males with guns.  Although the woman told
911 that she was not sure if the guns were real or "play" guns, doc. no. 75-2, this
information was not conveyed by dispatch.

Holcomb heard over the radio that a "burg two [was] in progress" and that
"several black males" carrying guns went into the house across the street from the

---

(quotation marks and citations omitted).  "Qualified immunity protects government officials from
liability for civil damages insofar as their conduct does not violate clearly established statutory or
constitutional rights."  <u>Wilkins v. City of Tulsa, Oklahoma</u>, 33 F.4th 1265, 1272 (10th Cir. 2022)
(quotation marks and citation omitted).

[3] At the time of the non-fatal shooting and the filing of this action, Clerkley was a minor.  As a
result, this case was commenced by Clerkley's mother, Cherelle Lee, on behalf of her son.  In
December of 2022, Clerkley turned 18 years old.  After the filing of defendants' summary
judgment motions, Clerkley moved for leave of court to be substituted as plaintiff, which was
granted by the court.  <i>See</i>, doc. nos. 81 and 82.

[4] For summary judgment purposes, the facts are construed in favor of Clerkley, as the non-moving
party.  <i>See</i>, <u>Arnold v. City of Olathe, Kansas</u>, 35 F.4th 778, 785 n.1 (10th Cir. 2022).

[5] Holcomb has been employed as an OCPD police officer since May 2009.

2

911 caller's house.  Doc. no.  75-1, ECF p. 11, l. 19; 1. 21.  The call was classified as a priority one call (danger to life or property) for second-degree burglary. Holcomb did not know the ages of any of the individuals who went into the house. They were all minors.

Holcomb and another police officer, Carlon Tschetter (Tschetter), arrived at the scene at the same time.  It was still daylight.  They parked a distance away and approached on foot.  Both officers were in uniform and wearing a body camera. Tschetter began walking toward a white car parked on the street, and Holcomb directed Tschetter to the "green house."  Doc. no. 75-5.  Tschetter then radioed the tag of the parked white car.  Holcomb radioed, "hey, they're back there."  *Id*. Hearing noises, Tschetter radioed "cap gun."  *Id*.; doc. no. 75-6.  Holcomb replied, "Huh?"  *Id*.  Tschetter, with his gun drawn, approached the front of the house, shouting, "Hey!  Police department!  Come on out!"  *Id*.

While Tschetter approached the front of the house, Holcomb went to the side of the house.  He began walking along a wooden fence.  From the sounds he was hearing, Holcomb radioed, "I think it's a cap gun, but they are shooting something off."  Doc. no. 75-5.  Tschetter radioed that the noises "could be paint ball."  Doc. no. 75-6.  Tschetter then shouted again, "Hey, this is the police department!  Come out now!"  Doc. no. 75-5; doc. no. 75-6.

Holcomb, with his gun drawn, stopped at a hole in the upper part of the wooden fence where he could see the back corner of the house and part of the backyard.  The backyard contained overgrown dead foliage.  Seconds later, Holcomb saw a black male in a gray hoodie near the corner of the house walking in his direction.  Holcomb shouted, "Show me your hands!  Drop it!"  Doc. no. 75-5.  He immediately fired four shots in quick succession at the black male.  Holcomb then yelled, "Drop the gun!"  *Id*.  The black male disappeared from Holcomb's sight. Holcomb reported on his radio "Shots fired.  Shots fired.  Black male with a gray

hoodie had the gun." *Id*.  Holcomb then continued to walk around the exterior of the fence, while another police officer took over Holcomb's position at the opening of the fence.

Holcomb had shot Clerkley in the right upper hip and left leg.  Once he was shot, Clerkley fell backwards, and one of his friends helped him into the house through a broken window.  Clerkley did not realize he had been shot until he was back in the house.  He involuntarily urinated on himself.  Hearing police officers shout for them to come out, Clerkley and his friend walked to the front of the house with two other friends.  Clerkley's legs started to give out on him.  He was the last one to leave the house and, as ordered by Tschetter, laid down on the side of the cement porch.  Several times, Tschetter ordered Clerkley to crawl to him, but Clerkley couldn't.  Tschetter dragged Clerkley by his hoodie off porch and to the ground beside him.  Clerkley had cut his hand on shattered glass that was on the porch.  Clerkley was handcuffed by another officer and taken into custody.

Two other black males, who had been in the house with Clerkley and other friends, had gone out the back window into the backyard.  Holcomb and the officer who took over Holcomb's position at the opening of the fence ordered the individuals to get on the ground and covered them with their guns until they were taken into custody by other officers.

Tschetter asked if someone was down in the backyard.  Doc. no. 75-5; doc. no. 75-6.  Holcomb asked the individuals in the backyard if one of them had been hit.  One responded that his friend in the front had been hit.  Clerkley, who overheard the questioning, advised that he had been shot.  Holcomb told Tschetter, "That looks like the one I shot at.  He was wearing a gray hoodie.  He's the one that had a gun." Doc. no. 75-5; doc. no. 75-6.  Tschetter asked Clerkley if he had a gun.  Clerkley responded that he didn't have the gun.  Both Holcomb and Tschetter asked who had the gun.  Clerkley replied that he did not know.  While Tschetter was checking to

see where Clerkley was shot, he asked Clerkley who had the gun and asked if it was him, and he replied, "no, sir."  Doc. no. 75-6.

The individual in the backyard covered by Holcomb had dreads and was wearing a gray hoodie and blue jeans.  Holcomb advised another officer that the individual matched the description given by the 911 caller, and said, "so I don't know."  Doc. no. 75-5.  One of the officers, who helped take custody of the individuals in the backyard, spotted a black gun on the ground in the backyard outside the window.  It was located near where the two individuals had been lying in the backyard.  The gun was later identified as a TDP 45 BB pistol.

While clearing the house for other individuals, officers observed three more guns inside.  All four guns found at the house were BB guns.  Two of the guns found inside the house were "Glock 19" BB pistols.

Holcomb radioed for medical assistance, and Clerkley was taken to the hospital for treatment of his gunshot wounds.  After being discharged from the hospital later that night, Clerkley was interviewed by Oklahoma City police detectives.  He advised that he and his friends went into the abandoned house because it was raining.  The door to the house was open.  While in the house, they shot off BB guns only discharging $CO_2$.  Clerkley described the gun he had shot as a "Glock."  Clerkley advised the police detectives that he held up his hands as ordered by Holcomb and that he did not have the gun when he was shot.  When they asked what he was wearing, Clerkley advised that he was wearing blue jeans, two shorts—one blue—underneath the jeans, Tommy Hilfiger draws, a black Polo shirt, and a gray Polo jacket.  According to Holcomb's body camera footage, the other pair of shorts Clerkley wore was black.

Clerkley testified at his deposition that he shot a BB gun inside the house and set it down on the cabinet in the kitchen.  He then walked around the house and went into a room at the back of the house.  He wanted to see what was in the backyard

and he went through a broken window with his right leg first and then his left leg. When his left leg came out of the window, he turned right.  He went two or three steps, and heard, "Freeze, drop it, drop it," and then gunshots.  Doc. no.  83-1, ECF p. 15, ll. 11-12.  In response to a question of whether he was "certain" he didn't have a gun when he went out the window, he testified, "Yes, ma'am."  *Id.*, ECF p. 28, ll. 18-21.

At his deposition, Holcomb testified that Clerkley had a gun in his hand and when he told Clerkley to show him his hands and drop it, the gun was pointed at Holcomb, and he fired his gun at Clerkley.  Holcomb testified the gun looked like his gun—a black handgun.

At his deposition, Holcomb answered, "No," to the question, "You not once told another officer when they asked you what had happened that somebody had pointed a gun at you, did you?"  Doc. no. 74-67, ECF p. 16, ll. 1-4.

2.   Training, Investigation, and Other Alleged Excessive Force Incident

Upon employment, Holcomb received over six months of training from the OCPD Training Academy.  During the training academy, Holcomb received training in the use of force, including the use of deadly force.  After attending the training academy, Holcomb received approximately four months of additional training with a field training officer.  In addition, Oklahoma law requires full-time police officers to complete 25 hours of continuing law enforcement training every year.  Prior to the shooting, Holcomb had attended 251 hours of in-service training.

The OCPD has a police operations manual which includes its current policies, procedures, and rules.  Holcomb was issued a digital copy of the manual and directed to be familiar with its contents and any updates.  He received training instruction from the manual.  In addition to other policies, the manual contained a use of force policy, which dealt with both the use of deadly and non-deadly force.  That policy provided that officers may use deadly force to protect themselves or others when

officers have probable cause to believe that they or others are in danger of death or serious bodily harm and that the use of deadly force is reasonably necessary to protect themselves or others.  It also provided that, if feasible, a warning should be given prior to the use of deadly force.  It further emphasized that mere suspicion is not sufficient to justify the use of deadly force.

In accordance with OCPD policies, an investigation of the shooting was conducted by two investigators from the homicide division of the OCPD.  One of the investigators, in a supplement report, provided a summary of Holcomb's body camera footage.  In that summary, the investigator did not mention Clerkley having a gun or anything in his hands.  He stated that Clerkley could be seen facing Holcomb.  From the footage, he captured screenshots of Clerkley appearing and facing Holcomb.  After the investigators presented to then-District Attorney David Prater their investigation findings and evidence regarding the shooting, Mr. Prater advised the police chief that he had determined Holcomb was justified in exercising deadly force in the defense of himself and other officers present at the scene.  According to Mr. Prater, Holcomb had a reasonable belief that he was about to be shot by Clerkley.  Mr. Prater cleared Holcomb for duty as the police chief saw fit.

Subsequently, in accordance with OCPD policies, an administrative review was conducted to determine whether Holcomb complied with the directives of the OCPD.  The administrative review was conducted by a lieutenant in the Office of Professional Standards of the OCPD.  In a memorandum to a captain in the Office of Professional Standards, the lieutenant concluded that the totality of the circumstances revealed that Holcomb fired his weapon to stop what he believed was a deadly threat.  Although he stated in his synopsis of the encounter that Clerkley was holding what appeared to be a handgun, he also acknowledged in the memorandum that Holcomb's body-worn camera video did not clearly capture the actions of Clerkley.  According to the lieutenant, the best footage was documented

in a frame-by-frame photo from the camera that showed Clerkley facing Holcomb. He then quoted from a statement given by Mr. Prater to The Oklahoman newspaper that "'[t]he suspect who exited the window had an object in his hand that appeared to be a firearm.  The suspect turned toward Sgt. Holcomb with the weapon in his hand, and Holcomb shot the suspect in self-defense.'"  Doc. no. 74-52, p. 3.  The lieutenant stated that while the firearm may have been a BB gun, Holcomb did not know this and identified it as a real firearm.  The lieutenant concluded that the totality of circumstances revealed that Holcomb fired his weapon to stop what he believed was a deadly threat.

Holcomb testified in deposition that he was told that his shooting of Clerkley was justified, was within department policy, and was consistent with the way he had been trained.

Holcomb and the City had previously been sued under § 1983 for Holcomb's alleged use of excessive force in Turner v. City of Oklahoma City, et al., CIV-16-08-W and CIV-18-796-JD.[6]  According to the complaint's allegations in CIV-18-796-JD, Holcomb approached a vehicle in which Negge Turner (Turner) was seated and stated he had an arrest warrant for Alteric Turner.  Turner provided Holcomb with three separate forms of identification and explained that Alteric Turner was his brother, and he did not know his whereabouts.  Holcomb insisted that Turner was Alteric Turner and forcibly extracted him from the vehicle.  During the extraction, Turner, who weighed approximately 103 pounds, informed Holcomb that he was a 100% service-connected disabled veteran, and he was unable to raise his hands over his head, but he would comply with Holcomb's instructions.  According to Turner, Holcomb picked him up and threw him to the ground and placed his entire

[6] According to court records, the parties filed a joint dismissal without prejudice of the original case, CIV-16-08-W, in August of 2017.  The case was refiled in August of 2018.

weight on his back of his neck.  And according to Turner, Holcomb continued to assault him after he was restrained in handcuffs.  After arrest, Turner informed Holcomb his left side had lost feeling and he had lost his ability to rotate his neck from side to side.  He said he needed medical attention and requested that he be transported to the hospital.  Turner alleged that Holcomb refused and transported him to the Oklahoma County jail.

Holcomb and the City claimed that Turner matched the description of Alteric Turner.  While exiting the vehicle, Turner swung his fist at Holcomb, and Holcomb took him to the ground.  After a struggle in which Turner bit him, Holcomb handcuffed and arrested Turner.  Turner was charged with assault and battery on a police officer and resisting arrest, but the criminal case was later dismissed.

According to court records, Turner's action against Holcomb was dismissed, upon motion, for failure to effect valid service of process.  *See*, CIV-18-796-JD, doc. no. 24.  Turner's action against the City was settled and a judgment was entered without an admission of liability.  *See*, *id*., doc. no. 49.

An investigation was conducted of Holcomb's encounter with Turner by a supervisor in accordance with the OCPD's police operations manual.  The report of the investigation was issued approximately two weeks after the incident.   It concluded that the use of force was within department policies.

<u>Legal Standard</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  "A disputed fact is material if it might affect the outcome of the suit under the governing law[.]"  <u>Palacios v. Fortuna</u>, 61 F.4th 1248, 1256 (10th Cir. 2023) (quotation marks and citation omitted).  On summary judgment, the court construes the facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor.  *Id*.  In qualified immunity cases, this generally

means adopting the plaintiff's version of the facts, unless the facts are contradicted by objective evidence, such as video surveillance footage.  *Id.*

As stated, both Holcomb and the City move for summary judgment.   And Holcomb moves for summary judgment asserting the defense of qualified immunity. Holcomb's "assertion of qualified immunity creates a presumption that [he is] immune from suit." Perea v. Baca, 817 F.3d 1198, 1202 (10ᵗʰ Cir. 2016).   To overcome this presumption, the plaintiff must show "(1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." Wilkins v. City of Tulsa, Oklahoma, 33 F.4ᵗʰ 1265, 1272 (10ᵗʰ Cir. 2022) (citations omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Wilkins, 33 F.4ᵗʰ at 1272.  "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.*  "[A] case directly on point is not necessary if existing precedent [has] placed the statutory or constitutional question beyond debate." *Id.*

Discussion

1. Qualified Immunity

   a. *Constitutional Violation*

A claim that a law enforcement officer has "used excessive force—deadly or not—in the course of arrest, investigatory stop, or other 'seizure' of a free citizen" is "analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis omitted).  "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable."  Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1259 (10ᵗʰ Cir. 2008).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with

10

the 20/20 vision of hindsight," and the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-397.

The Fourth Amendment permits an officer to use deadly force[7] "if a reasonable officer in [the defendant's] position would have had probable cause to believe that there was a threat of serious physical harm to [himself] or to others." Larsen, 511 F.3d at 1260 (emphasis omitted). The court assesses "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* If an officer "reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Id.*; *see also*, Tenorio v. Pitzer, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The belief need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable.")

To assist in assessing whether the use of deadly force is reasonable, the Tenth Circuit employs two frameworks. First, it considers three nonexclusive factors identified by the Supreme Court in Graham v. Connor, *supra*. These factors, referred to as the Graham factors, are "(1) 'the severity of the crime at issue;' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others;' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" Palacios, 61 F.4th at 1256 (quoting Graham, 490 U.S. at 396). With respect to the second factor, which is "undoubtedly the 'most important' and fact intensive factor,"

---

[7] "Deadly force is 'force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person . . . constitutes deadly force.'" Jiron v. City of Lakewood, 392 F.3d 410, 415 n. 2 (10th Cir. 2004) (quoting Ryder v. City of Topeka, 814 F.2d 1412, 1416 n. 11 (10th Cir. 1987)).

Pauly v. White, 874 F.3d 1197, 1215-16 (10th Cir. 2017), the Tenth Circuit enunciated four nonexclusive factors in the Estate of Larsen ex rel. Sturdivan v. Murr, *supra.*, for assessing the threat posed by a suspect.  These factors, referred to as the Larsen factors, are:  "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and suspect; and (4) the manifest intentions of the suspect." Larsen, 511 F.3d at 1260.

       i.  Graham and Larsen Factors

*Severity of the Crime at Issue*

The first Graham factor inquires as to the "severity of the crime at issue[.]" Graham, 490 U.S. at 396.  Under Tenth Circuit precedent, "[w]hen the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the plaintiff." Palacios, 61 F.4th at 1256.  Here, Holcomb responded to a call classified priority one for second-degree burglary.  Under Oklahoma law, the crime of second-degree burglary is a felony.  *See*, 21 O.S. § 1436(2).[8]  As a result, the court finds that the first Graham factor weighs against Clerkley as to a finding that use of deadly force was objectively unreasonable.

*Actively Resisting or Attempting to Evade Arrest by Flight*

Turning to the third Graham factor, active resistance or evasion of arrest by flight, the court finds that the factor weighs in favor of Clerkley.  Although Holcomb

---

[8] The court rejects Clerkley's argument that at the moment Holcomb encountered him, he was suspected of "either trespassing or, at worst, second degree burglary of an abandoned house, and therefore was a nonviolent misdemeanant[.]"  Doc. no. 83, ECF p. 16 (quotation marks and citation omitted).  Clerkley admits that Holcomb was responding to a call classified as priority one for second-degree burglary.  And Clerkley proffers no authority that second-degree burglary of an abandoned house qualifies as a misdemeanor rather than a felony.

had responded to the call of a second-degree burglary in progress, the court finds no evidence upon which a reasonable jury could conclude that when Holcomb encountered Clerkley, he had probable cause to arrest Clerkley for the crime of second-degree burglary or could have reasonably intended to arrest him.  Holcomb did not know then whether Clerkley's actions were unlawful.  Consequently, Clerkley could not have been actively resisting arrest or attempting to evade arrest by flight when he encountered Holcomb.  *See*, Estate of Taylor v. Salt Lake City, 16 F.4th 744, 764 (10th Cir. 2021) (finding third Graham factor favors plaintiffs where, at the time officers approached and interacted with the suspect and two companions, they did not have probable cause to make an arrest, nor could they reasonably have intended to make an arrest).

*Immediacy of the Threat*

"Although the first and third [Graham] factors can be particularly significant in a specific case, the second factor—whether there is an immediate threat to safety—'is undoubtedly the most important . . . factor in determining the objective reasonableness of an officer's use of force.'"   Estate of Valverde by & through Padilla v. Dodge, 967 F.3d 1049, 1060-61 (10th Cir. 2020) (quoting Pauly, 874 F.3d at 1216).  The importance of the second Graham factor is "particularly true in a deadly force case, because deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." Reavis Estate of Coale  v. Frost, 967 F.3d 978, 985 (10th Cir. 2020) (quotation marks and citation omitted).

Here, if Clerkley's version of events is believed, a reasonable jury could find that he did not have a gun in his hand when he was shot by Holcomb and that there was no threat of serious physical harm to Holcomb or others.  Although Holcomb contends and testified that Clerkley had a gun and pointed the gun at him, that is a fact question for the jury.  Holcomb's body camera footage and the still-framed

photographs of Clerkley from the footage (doc. nos. 75-9, p. 2, and 75-10) do not plainly contradict Clerkley's evidence that he did not possess a gun during his initial brief encounter with Holcomb.  And the presence of a gun in the backyard near the broken window where Clerkley exited does not suffice to eliminate the question of fact.  There were other black males apprehended in the backyard, one of whom matched the 911 caller's description of the individual possessing a gun, which Holcomb acknowledged to another officer.

In his briefing, Holcomb argues that even if Clerkley has raised a genuine dispute as to whether he was armed with a gun, the fact that Clerkley was unarmed does not resolve whether Holcomb violated his Fourth Amendment rights.  Citing Estate of Taylor v. Salt Lake City, 16 F.4th at 765, Holcomb argues the salient question is whether his "mistaken perception" that Clerkley was about to use a firearm against him was reasonable.  Holcomb contends that Clerkley has not established a question of fact regarding whether he "could reasonably have believed that [Clerkley] posed a mortal threat." Doc. no. 86 (quoting Taylor, 16 F.4th at 765).

The court turns to the Larsen factors which are designed to assist in evaluating the degree of threat posed by Clerkley.  As stated, these factors include: whether the officer ordered the suspect to drop his weapon, and his compliance with police commands; whether any hostile motions were made with the weapon towards the officer; the distance separating the officer and the suspect; and the manifest intentions of the suspect.  Larsen, 511 F.3d at 1260.

First, Holcomb's body camera footage shows that Holcomb shouted for Clerkley to show his hands and drop "it" and then immediately fired shots at Clerkley.[9]  The footage doesn't show that Clerkley had ignored or deliberately

---

[9] Holcomb did not order Clerkley to drop the gun until after he shot him.  And the evidence shows that after he was shot, Clerkley fell backwards and was helped into the broken window by a friend.

disobeyed Holcomb's commands insofar as he could comply.  He told the investigators after the shooting that he held his hands up as ordered by Holcomb. And the evidence, viewed in Clerkley's favor, indicates that he did not have a gun or anything in his hand.  Therefore, he could not drop "it" if he did not have anything in his hand.  Further, the evidence, viewed in Clerkley's favor, shows that Holcomb shot Clerkley immediately after giving the commands.  The court concludes that the first <u>Larsen</u> factor favors Clerkley.

Second, while Holcomb responded to a call of a second-degree burglary in progress, had been told that several black males had guns, and heard noises that sounded like a cap gun but believed that they were shooting something off, and Clerkley wore a gray hoodie and blue jeans partially matching the 911 caller's description of the individual with a gun, the body camera footage doesn't show that Clerkley made any hostile motions or threatening gestures with a weapon, or anything else, toward the officer.  Holcomb points out that the footage and the still-framed photographs show that Clerkley was walking in his direction and that he had something black in or near his hand.  Although Holcomb admitted in deposition that the still-framed photographs were not totally clear, he testified that his "eyes saw a gun." Doc. no. 75-1, ECF p. 6, l. 7.  The court, however, concludes that a reasonable jury could conclude that the footage and the still-framed photographs do not show that Clerkley was holding something black in his hand.  A reasonable jury could also conclude that although he was walking in Holcomb's direction, Clerkley was not looking in his direction.  And a reasonable jury could additionally conclude that Holcomb, during the daylight hours and with Clerkley facing him, could observe that Clerkley did not have a gun or anything his hand.  This is true, in the court's view, despite the presence of dead foliage in the backyard.  A reasonable jury could find that a reasonable officer in Holcomb's position would have recognized that Clerkley did not have a gun or anything in his hand and that Clerkley was not making

15

any hostile motions or threatening gestures towards him.  The court thus concludes that the second Larsen factor favors Clerkley.

Third, although the evidence does not clearly indicate the distance between Clerkley and Holcomb, the evidence establishes that Holcomb was not far away from Clerkley.  While Holcomb was behind a fence, the fence was wooden, and Holcomb had been looking into the backyard through a hole in the upper portion of the fence, the court concludes that no reasonable jury could conclude that Holcomb was in a position of sufficient cover to avoid potential harm, if Clerkley possessed and fired a gun at Holcomb.  The court concludes that the third factor favors Holcomb.

Fourth, the footage and the still-framed photographs do not show that Clerkley manifested any hostile intentions towards Holcomb.  In briefing, Holcomb argues that Clerkley manifested intentions that were hostile by exiting the house through the back window.  Holcomb maintains that an individual crawling out the window after an announcement that police are in the front of the house could reasonably be perceived by a reasonable officer as hostile.  However, there is no evidence in the record to support that a reasonable officer, in Holcomb's position, would have known Clerkley had crawled or exited out of the back window.  Holcomb's camera footage does not show Clerkley coming out of the back window.  Viewing the evidence in a light most favorable to Clerkley, the court concludes that a reasonable jury could conclude that Clerkley did not manifest any intentions that were hostile and malevolent towards Holcomb.

In sum, the first, second, and fourth Larsen factors weigh in Clerkley's favor, and the third favors of Holcomb.

Considering the Graham factors, the Larsen factors, and the totality of the circumstances in a light most favorable to Clerkley, the court concludes that a reasonable jury could conclude that Holcomb's mistaken perceptions—that

Clerkley was pointing a gun at him at the precise moment he fired his gun and that Clerkley posed a serious threat of physical harm to Holcomb or others—were not reasonable.

The court recognizes that Holcomb's encounter with Clerkley occurred under circumstances that were "tense, uncertain and rapidly evolving[,]" which required Holcomb to make a "split-second judgment[]" about the need for deadly force. In addition, it recognizes that it can't view the facts "with 20/20 vision of hindsight" but instead must consider them "from the perspective of a reasonable officer on the scene[.]" Graham, 490 U.S. at 396-397. However, viewing the facts and reasonable inferences in a light most favorable to Clerkley, the court finds that a reasonable jury could conclude that Holcomb fired his gun at Clerkley when he could see he did not have a gun or anything in his hand. A reasonable jury could conclude that a reasonable officer in Holcomb's position would not have reasonably believed that Clerkley posed a mortal threat to Holcomb or others. Therefore, a reasonable jury could find that Holcomb's use of deadly force was in violation of the Fourth Amendment. (The court hastens to emphasize that this is a close question. And, of course, the issues to be decided by the jury are not identical to the issues presented by the present motions.)

  b. *Clearly Established Law*

Having found that the evidence, viewed in Clerkley's favor, demonstrates a Fourth Amendment violation, the court must decide if Clerkley has shown that Holcomb's actions of using deadly force violated clearly established law. "'To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.'" Wise v. Caffey, 72 F.4th 1199, 1208 (10th Cir. 2023) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). However, "'[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his

17

conduct was unlawful in the situation he confronted.'"   *Id*. (quoting City of Tahlequah v. Bond, 142 S. Ct. 9, 11 (2021).  This is "especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  Bond, 142 S. Ct. at 11-12 (quotation marks and citation omitted).  "[T]he salient question is whether the state of the law gave the defendant[] fair warning that [his] alleged treatment of the plaintiff[] was unconstitutional."  Wise, 72 F.4th at 1209 (quotation marks and citations omitted).  "The law was clearly established if it was sufficiently clear that every reasonable officer would understand that what he is doing is unlawful."  *Id*. (quotation marks and citations omitted).

Clerkley, in briefing, cites, among other cases, the Tenth Circuit's decision in Finch v. Rapp, 38 F.4th 1234 (10th Cir. 2022), in support of his position that Holcomb's actions of using deadly force violated clearly established law.  That case, decided after the shooting in this case, cannot itself establish that Holcomb's use of deadly force violated clearly established law.  However, the shooting in Finch took place on December 28, 2017, prior to the shooting in this case, and it relied upon cases decided before December 28, 2017, to conclude that the officer's shooting in that case had violated clearly established law.  Consequently, the court concludes the Finch case is instructive.  *See*, Finch, 38 F.4th at 1243.

In Finch, police officers rushed to Andrew Finch's house, in response to a "hoax emergency call" that led them to believe they were responding to a "deranged man who had just killed his father and was holding the rest of his family hostage at gunpoint."  *Id*. at 1237.  "Finch had not committed any crime and had no way of knowing why police were surrounding his home."  *Id*.   As he exited the house, "multiple officers yelled different commands."  *Id*.  However, they did not identify themselves as police.  Finch "initially appeared to comply with the officer

commands, raising his hands up to about ear level." *Id*. at 1239. Officers could see he was not holding anything in his hands. "Finch then began to lower his hands," and there was conflicting testimony about what happened next. *Id*. "Some officers testified Finch raised his hands and lowered them a second time while moving towards the doorway threshold;" "one officer testified he "saw nothing indicating Finch was a threat to the officers, but he lost sight of Finch once Finch backed up into the doorway;" another officer testified that "Finch moved his hand towards the small of his back and moved back into the doorway[,]" but he "was not sure whether the movement was threatening;" and a third officer believed "Finch was reaching for a weapon when he saw Finch put his hands back down." *Id*. The defendant officer testified that he "saw Finch grab the right side of his hoodie and lift it up, making a motion that appeared as if he was drawing a firearm . . . and possibly was armed." *Id*. He testified that "he thought he saw a gun in Finch's hand." *Id*.

The Tenth Circuit affirmed the district court's decision denying qualified immunity to the defendant officer. The appellate court accepted the district court's factual determinations that "a reasonable jury could find that (1) [the officer] fired a shot when he could see Finch's hands were empty, (2) [the officer's] assertion that Finch made a threatening motion was false, and (3) [the officer] could not see Finch's movements clearly due to darkness and distance, along with numerous other facts." *Id*. at 1241. Thus, "a reasonable jury could also conclude that [the officer] did not reasonably believe Finch posed a threat." *Id*.

Accepting the district court's factual determinations, the Tenth Circuit agreed with the district court that as of December 28, 2017, Tenth Circuit law[10] clearly

---

[10] The four Tenth Circuit cases relied upon by the district court as determining clearly established law, <u>Zuchel v. Spinharney</u>, 890 F.2d 273 (10th Cir. 1989); <u>Zia Trust Co. ex rel. Causey v. Montoya</u>, 597 F.3d 1150 (10th Cir. 2010); <u>Walker v. City of Orem</u>, 451 F.3d 1139, 1157 (10th Cir. 2006); and <u>King v. Hill</u>, 615 Fed. Appx. 470 (10th Cir. 2015).

established that "an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect." *Id*. at 1243.  Because a "jury could find [the officer] shot Finch even when a reasonable officer would have known Finch was unarmed and posed no threat," the Tenth Circuit found that the facts, viewed in a light most favorable to Finch, violated "clearly established law." *Id*. at 1243-44.

The court reaches the same conclusion here.  Viewing the facts in a light most favorable to Clerkley, a reasonable jury could conclude that Holcomb shot Clerkley "even when a reasonable officer would have known [Clerkley] was unarmed and posed no threat," and thus, Holcomb "violated clearly established law." Finch, 38 F.4th at 1243-44.

The record, viewed in Clerkley's favor, discloses facts from which a reasonable jury could find a violation of Clerkley's Fourth Amendment rights by Holcomb and that the right was clearly established at the time of the violation. Consequently, the court concludes that Holcomb is not entitled to summary judgment based on the defense of qualified immunity.  Holcomb's motion will therefore be denied.

  2. Municipal Liability

A municipality may not be held liable under § 1983 solely because its employee inflicted injury on the plaintiff.  Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).  Rather, to hold a municipality liable for the actions of its employees, the plaintiff must show that the municipality had a policy or custom that caused the plaintiff's injury.  *Id*.  A municipal policy or custom may take the form of a formal regulation or policy; a widespread, permanent, and well-settled custom; a decision by an employee with final policymaking authority; a final policymaker's ratification of both an employee's unconstitutional actions and the basis for them; or the deliberately indifferent failure to adequately train or supervise

employees.  *Id*.  Here, Clerkley's municipal liability claim is based upon failure to adequately train Holcomb and ratification of Holcomb's conduct.  Doc. no. 84, ECF p. 10.

"'[T]o establish a municipality's liability for inadequate training on the use of force, a plaintiff must meet a four part test:'

> A plaintiff must show (1) the officer[] exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact[;] and (4) there is a direct causal link between the constitutional deprivation and the inadequate training."

Huff v. Reeves, 996 F.3d 1082, 1092 (10th Cir. 2021) (quoting Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)).

Clerkley asserts that the City "[failed] to train OCPD officers with respect to the use of force on suspects or detainees who are unarmed or otherwise pose no threat of harm."  Doc. no. 84, ECF p. 11.  However, it is undisputed by Clerkley that OCPD officers, including Holcomb, were trained on the proper use of force, including the use of deadly force.  Officers were trained to use deadly force only when necessary to defend themselves or others from imminent harm, either serious bodily injury or death.  In his papers, Clerkley has failed to identify what additional training regarding unarmed suspects or suspects that pose no threat of harm would have caused Holcomb not to fire his gun at Clerkley when he was unarmed and not posing a threat.  The Tenth Circuit has "repeatedly held that conclusory or generalized failure-to-train allegations are insufficient."  Huff, 996 F.3d at 1093.  A plaintiff must identify a specific deficiency in the entity's training program closely related to his ultimate injury.  Clerkley has not pointed to any training by the OCPD that would have prevented his alleged constitutional violation.  Because there is no

"direct causal link between the [alleged] constitutional deprivation and the [alleged] inadequate training," Huff, 996 F.3d at 1093, Clerkley's failure to adequately train claim against the City fails.

In his briefing, Clerkley argues out that Holcomb previously used excessive force in arresting Turner, but he was not disciplined by the City. However, while Holcomb and the City were previously sued by Turner for alleged use of excessive force, Clerkley does not show that any finding was made that Holcomb subjected Turner to the use of excessive force. Turner's § 1983 action against Holcomb was dismissed, and his § 1983 action against the City was settled and a judgment entered without an admission of liability. Further, the alleged force used by Holcomb against Turner did not involve shooting a firearm. The allegations regarding Holcomb's actions against Turner do not support a finding that the OCPD had a specific deficiency in its training program with respect to the use of deadly force. Nor are the allegations sufficient to demonstrate that the City had notice that its training on the use of deadly force was inadequate.

Clerkley also argues that the City is liable under § 1983 because it ratified Holcomb's unconstitutional conduct by determining that it was within policy. He points to the lieutenant's investigation and findings after the shooting. However, assuming without deciding that the evidence, viewed in Clerkley's favor, is sufficient to establish the City's ratification of Holcomb's conduct, the evidence is not sufficient for a reasonable jury to find that the alleged ratification caused the alleged constitutional violation. As explained by the Tenth Circuit, ratification occurring *after* an alleged violation does not show that it caused the violation. *See*, Cordova v. Aragon, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[le]s of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation.") (emphasis in original). Here, the lieutenant's investigation and findings regarding Holcomb's conduct occurred after

Holcomb's shooting of Clerkley.  Consequently, the City's alleged after-the-fact ratification of Holcomb's alleged misconduct conduct is insufficient to establish a municipal liability claim against the City.[11]  Clerkley's ratification theory therefore fails.

Because Clerkley has failed to establish a municipal policy or custom that caused his alleged injuries, the court concludes that the City is entitled to summary judgment on the § 1983 municipal liability claim.

3. Negligent Use of Excessive Force

In his complaint, Clerkley has alleged a state law claim against the City for Holcomb's negligent use of excessive force.  The City contends it cannot be held liable on this claim.[12]  First, the City points out that, under the Governmental Tort Claims Act (Act), 51 O.S. § 151, *et seq*., a political subdivision, like a municipality, "shall be liable for loss resulting from . . . the torts of its employees acting within the scope of their employment *subject to the limitations and exceptions specified* in the" Act.   51 O.S. § 153 (emphasis added).  The City asserts that one of the exceptions, otherwise known as exemptions, specified in the Act, is that a municipality "shall not be liable if a loss or claim results from . . . [a]ny claim which is limited or barred by any other law[.]"  51 O.S. § 155(16).  The City argues that under Oklahoma statutes 21 O.S. § 732 and 21 O.S. § 1289.25(D), Holcomb was specifically authorized to use deadly force since he believed Clerkley was armed, and he reasonably feared for his safety and that of his fellow officers.  However, the court

---

[11] To the extent Clerkley relies upon Holcomb's alleged use of excessive force in connection with the arrest of Negge Turner to establish ratification, the court finds that such evidence is insufficient to establish the claim.  In addition to being five years prior to the shooting in this case, the incident with Mr. Turner did not involve the use of firearm.

[12] In his papers, Clerkley does not respond to the City's arguments regarding the state law claim. Although the court deems the City's motion confessed as to the state law claim arguments, the court, for the reasons stated, concludes that the City has failed to show that it is entitled to judgment as a matter of law.

has previously found that a reasonable jury could find that Clerkley did not have a gun or anything else in his hand, and that Holcomb's mistaken perceptions with respect to Clerkley being armed and posing a threat of serious physical harm to Holcomb or others were unreasonable.  Consequently, the court rejects the City's argument that it is exempt from liability under § 155(16) based upon the two cited statutes.[13]

Next, the City argues that it cannot be held liable for the negligent use of excessive force claim because the actions of Clerkley and his friends in unlawfully entering the vacant house with guns constitute a supervening act for which Holcomb's negligence, if any, "is removed or wiped clean."  Doc. no. 74, ECF p. 32.  According to the City, Holcomb's and the other officers' actions merely furnished the condition that Clerkley might suffer injury and that their actions were not the proximate cause of Clerkley's injuries.  The City maintains that Clerkley's injuries were the result of his own criminal acts.

In support of its argument, the City relies upon Felty v. City of Lawton, 578 P.2d 757 (Okla. 1977).  There, plaintiffs sued the City of Lawton and a Lawton police officer, alleging that the officer's negligence, while acting as an agent for the city, was the proximate cause of their daughter's death in an automobile accident.  The liability of the city and the officer was based upon the negligence of the officer in having left his marked police cruiser unattended with the keys in the ignition and

---

[13] Further, the Oklahoma Supreme Court previously rejected a similar argument that a law which arguably creates an affirmative defense to liability by the agency's employee renders a municipality immune from suit based on § 155(16).  See, Morales v. City of Oklahoma ex rel. Oklahoma City Police Dept., 230 P.3d 869, 877-78 (Okla. 2010) ("A police officer's privilege to use reasonable force in making an arrest, sometimes conceptualized as providing qualified immunity, should not be confused with an immunity that bars a suit ab initio.  The privilege merely provides a defense to liability, the availability of which to City is by virtue of § 155(16) commensurate with its availability to Officer McCoy.  City is clearly not entitled to judgment of exoneration based on § 155(16).").

with the motor running.  A thief stole the police car, driving it in a reckless and careless manner, causing injury, and the daughter's ultimate death.  The question on appeal was whether the officer's negligence was the proximate cause of the daughter's injury.  The Oklahoma Supreme Court found it was not.  In so doing, it followed the holding in Merchants Delivery Service, Inc. v. Joe Esco Tire Co., 533 P.2d 601 (Okla. 1975), that "the proximate cause of an injury must be the efficient cause which sets in motion the chain of circumstances leading to the injury; if the negligence complained of merely furnishes a condition by which the injury was made possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury."  Felty, 578 P.2d at 760 (quotation marks omitted).  The Oklahoma Supreme Court concluded that the officer's negligence merely furnished a condition by which the injury was made possible but did not constitute the proximate cause of the daughter's injury.

Here, the acts of Clerkley in entering the vacant house with guns were not a subsequent independent, unforeseeable act which caused Clerkley's injury.  Further, the facts, viewed in Clerkley's favor, support that a finding that Holcomb shot Clerkley when he was unarmed and did not pose a threat of serious physical harm to Holcomb or others.  As a result, Holcomb's alleged negligence in shooting Clerkley would be the proximate cause of Clerkley's injuries rather than merely furnishing the condition by which the injury was made possible.  Further, despite the City's argument that the City should not be responsible because Clerkley had engaged in criminal acts, the Oklahoma Supreme Court in Morales allowed a negligence claim based on an officer's alleged use of excessive force to proceed even though the force occurred during the arrest of an individual.

In sum, the court concludes that the City is not entitled as a matter of law to summary judgment on the state law claim of negligent use of excessive force.[14]

<u>Conclusion</u>

The court again emphasizes that the conclusions it reaches in this order cannot be taken to foreshadow a final outcome adverse to Officer Holcomb or the City. The conclusions the court reaches here are, for the most part, driven by the existence of serious fact issues–issues which could ultimately go either way. That said, for the reasons stated, the Motion for Summary Judgment of Defendant Kyle Holcomb (doc. no. 75) is **DENIED**. Defendant City's Motion for Summary Judgment (doc. no. 74) is **GRANTED** with respect to the 42 U.S.C. § 1983 municipal liability claim and **DENIED** with respect to the state law negligent use of excessive force claim.

DATED this 14th day of August, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0465p023.rev.docx

---

[14] The City also challenges the negligent use of excessive force to the extent it is based on its alleged inadequate training of Holcomb. However, it appears to the court from the allegations in the complaint that Clerkley is not seeking to hold the City independently liable for negligence based on inadequate training. The court thus need not address the City's argument.